IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 20-00136-01-CR-W-BP |
| ) | |
| ) | |
| WALTER D. THOMPSON, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant Walter Thompson's Motion to Suppress filed on September 29, 2020. Doc. 22.[1] The Government filed Suggestions in Opposition on October 9, 2020. Doc. 23. For the reasons set forth below, it is recommended that Defendant's motion be DENIED.

### I. BACKGROUND

On June 23, 2020, the Grand Jury returned a one-count indictment that charged Defendant Thompson with knowingly and intentionally possessing with intent to distribute 50 grams or more of methamphetamine (actual) in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Doc. 9. The alleged offense involved controlled substances seized from Defendant after his belongings were searched by law enforcement officers at the Kansas City Amtrak train station. The search and seizure are the subject of Defendant's pending motion to suppress.

---

[1] The Court also considered Defendant's *pro se* Supplemental Brief with Suggestions in Support filed January 29, 2021. Doc. 37-1 at 7-20. Although *pro se* filings are not typically accepted by the Court when a defendant is represented by counsel, the Court considered Mr. Thompson's filing due to the concerns he has previously raised regarding his representation.

On November 9, 2020, the undersigned held an evidentiary hearing on Defendant's suppression motion. Mr. Thompson was present and represented by counsel, Bob Kuchar. The Government was represented by Assistant United States Attorney Mike Green. At the evidentiary hearing, three witnesses testified: (1) Detective Jared Lanaman, (2) Detective Colin Love, and (3) Defendant Walter Thompson. Additionally, twelve exhibits were admitted into evidence:

Gov't Exhibit 1 – Indiana operating license for Adam Ross Bray.

Gov't Exhibit 2 – Indiana identification card for Walter Douglas Thompson.

Gov't Exhibit 3 – Picture of Defendant's backpack with white box inside.

Gov't Exhibit 4 – Picture of white Chromebook box bearing the logo "Lenovo."

Gov't Exhibit 5 – Picture of gray plastic sack found inside Chromebook box.

Gov't Exhibit 6 – Picture of five Ziploc bags containing white substance.

Gov't Exhibit 7 – Picture of scale with the Ziploc bags on it reflecting the total weight of 380.15 grams.

Gov't Exhibit 9 – Picture of scale with one Ziploc bag on it reflecting the total weight of 83.79 grams.

Gov't Exhibit 10 – Picture of Ziploc vacuum sealed bag with smaller Ziploc bag inside.

Gov't Exhibit 11 – Picture of Ziploc bag containing white substance.

Gov't Exhibit 13 – Amtrak eTicket.

Gov't Exhibit 14 – Kansas City Missouri Police Department Incident Report dated June 15, 2020.

## II.     FINDINGS OF FACT

Based on the evidence adduced at the evidentiary hearing, the undersigned submits the following findings of fact:

2

1. In June 2020, Detective Jared Lanaman, a twenty-year officer with the Kansas City Missouri Police Department, was assigned to the Missouri Western Interdiction Narcotics Team ("MOWIN") as a narcotics detection K-9 handler and interdiction detective. Tr. at 5-6.[2]

2. As part of his MOWIN assignment, Detective Lanaman principally worked at Amtrak train terminals, Greyhound bus terminals, airports, and also conducted parcel searches. Tr. at 6.

3. On June 15, 2020, Detective Lanaman was working at the Amtrak train station located at 30 West Pershing Street in Kansas City, Missouri. Tr. at 6-7.

4. Detective Colin Love was serving as Detective Lanaman's back-up officer on June 15, 2020. Tr. at 7, 47.

5. When Detective Lanaman conducted interdiction at the Amtrak station, he typically focused on a train referred to as the "Number 4" train. Tr. at 6.

6. Detective Lanaman focused on the Number 4 train because it originates from Los Angeles and stops in places like Las Vegas, which he knows to be large scale distribution and trafficking areas. Tr. at 7.

7. On June 15, 2020, the Number 4 train arrived at approximately 6:15 a.m. Tr. at 7.

8. Upon arrival, Detective Lanaman had his narcotics canine perform an open-air sniff of the train's luggage compartment and luggage car. Tr. at 7-8, 48.

9. The canine did not alert to the presence of narcotics in the luggage compartment or the luggage car of the train so Detective Lanaman returned the canine to his vehicle. Tr. at 8, 48.

---

[2] "Tr." refers to the Transcript of Hearing on Motion to Suppress. Doc. 36.

10. Detectives Lanaman and Love next walked through the passenger cars of the train looking for suspicious bags.  Tr. at 8, 47-48.

11. As the assisting officer, Detective Love did not take a primary role in the interdiction activities.  Tr. at 48.  Detective Love tried to remain six to ten feet behind Detective Lanaman in an observational and supportive role.  Tr. at 48.

12. While walking through the train, Detective Lanaman noticed Defendant sitting in a passenger chair with a duffel bag and a backpack tucked underneath his legs.  Tr. at 9.

13. Detective Lanaman also noticed the baggage space above Defendant's seat was completely open.  Tr. at 9, 27.

14. Based on Defendant's behavior with his luggage, and the detective's prior experiences, Detective Lanaman believed Defendant to be guarding his bags.  Tr. at 9-10, 27.

15. As a result, Detective Lanaman approached Defendant to initiate a consensual contact.  Tr. at 10.

16. During the initial encounter, Detective Lanaman was standing in the aisleway by the seat, approximately three to four feet away from Defendant, while Defendant was seated next to the window.  Tr. at 29.

17. Detective Lanaman wore plain clothes with his firearm hidden and not displayed.  Tr. at 10, 16, 50.

18. Detective Love, who was standing several rows behind Defendant, out of Defendant's sight, also had his firearm completely concealed.  Tr. at 30-31, 43-45, 49, 50, 59.

19. Detective Lanaman asked Defendant if he would be willing to speak with him, to which Defendant responded "sure."  Tr. at 10.

20. Detective Love was not part of the initial encounter between Detective Lanaman and Defendant, and he could not hear the conversation between them. Tr. at 44, 50.

21. According to Detective Lanaman, Defendant did not appear to be under the influence of any controlled substance or alcohol. Tr. at 22.

22. Detective Lanaman described Defendant as being polite and cooperative. Tr. at 21. Defendant appeared to be of at least average intelligence. Tr. at 22.

23. Detective Lanaman advised Defendant that he worked with the MOWIN Drug Task Force and displayed his badge before returning those items to his pocket. Tr. at 10-11, 30.

24. Defendant advised he was traveling from Arizona where he had visited his girlfriend. Tr. at 11.

25. When asked for his identification and ticket, Defendant voluntarily produced both items to Detective Lanaman. Tr. at 11-12.

26. The identification Defendant provided was for an adult named "Adam Ross Bray." Tr. at 13; Gov't Exhibit 1.

27. The eTicket Defendant provided was also in the name of "Adam Bray" and showed a prior Amtrak trip from Naperville, Illinois to Flagstaff, Arizona. Tr. at 12; Gov't Exhibit 13.

28. After inspecting the ticket and the identification, Detective Lanaman returned both items to Defendant and asked if he could search his bags. Tr. at 13.

29. Detective Lanaman testified Defendant consented to the search, immediately opened his backpack, and began taking items out of the bag. Tr. at 13-14.

5

30. Detective Love also observed Defendant open his bag and start to show its contents to Detective Lanaman. Tr. at 50.

31. Due to safety concerns, Detective Lanaman asked Defendant if he would allow the detective to search the bag himself for any weapons or drugs. Tr. at 14-15.

32. At this time, Defendant closed his backpack and indicated he did not want Detective Lanaman to "go into" his bag. Tr. at 15, 33-34.

33. Detective Lanaman next asked Defendant if he would be willing to allow his canine to sniff the bags. Tr. at 15, 34.

34. Detective Lanaman testified that Defendant agreed to this request by responding "that's fine." Tr. at 15.

35. Detective Lanaman asked Defendant if he would be willing to take the bags off the train and place them on the outside platform so the canine could sniff them there. Tr. at 15.

36. Both detectives testified that Defendant stood up, grabbed his bags, put his backpack on, and walked off the train. Tr. at 15, 37-38, 50-51.

37. Both detectives testified Defendant carried his own bags off the train. Tr. at 15-16, 51.

38. Detective Lanaman testified he followed Defendant, and Detective Love followed Detective Lanaman as they he walked off the train. Tr. at 38.

39. Detective Love testified that Detective Lanaman walked off the train first, followed by Defendant and then Detective Love. Tr. at 61.[3]

---

[3] The testimony from the detectives concerning the order in which the group exited the train was not consistent. The Court finds this inconsistency is not material to the analysis of the legal issues raised in the suppression motion. Based on the demeanor of both detectives when they testified at the hearing, the Court finds this discrepancy in their testimony was not the result of any motive to deceive or bad faith on the part of either officer. The testimony of the detectives was consistent on all other material aspects of the initial encounter and subsequent search.

6

40. Once they were off the train and on the platform, Detective Lanaman told Defendant he could set his duffel bag and backpack down while Detective Lanaman went to retrieve his dog. Tr. at 16.

41. Detective Lanaman left Defendant standing on the platform with Detective Love while he went to retrieve the canine. Tr. at 16, 38-39, 51-52.

42. Upon returning with the canine, Detective Lanaman began presenting her with various items to sniff. Tr. at 18.

43. When the canine sniffed Defendant's duffel bag, she alerted to the presence of narcotics odor by sitting. Tr. at 18, 40-42, 52.

44. Detective Lanaman advised Defendant the canine had positively alerted to the odor of narcotics coming from the duffel bag, and asked if, based on the canine's alert, Defendant would allow him to search the bag. Tr. at 18, 52-53.

45. Both detectives testified that Defendant responded to the request to search by stating "just go ahead." Tr. at 18, 53.

46. Detective Lanaman left to return the canine to his vehicle. Tr. at 19.

47. Detective Love began his search of Defendant's duffel bag, which contained a Wal-Mart sack with a box inside labeled "Pioneer Women." Tr. at 53, 55.

48. When Detective Love opened the box, he discovered a plastic souvenir boot that contained a gray baggy. Tr. at 53.

49. Inside the gray baggy, Detective Love found a white sealed baggy containing a white crystal substance which he believed to be methamphetamine. Tr. at 54-55.

50. Upon his return, Detective Lanaman observed that Detective Love had discovered narcotics while searching Defendant's duffel bag. Tr. at 19.

51. Based on his experience, Detective Lanaman also recognized the white crystal substance to be methamphetamine. Tr. at 19, 54.

52. Both detectives testified that Detective Lanaman placed Defendant under arrest on a twenty-four-hour investigative hold. Tr. at 19, 54.

53. While waiting for transportation, the officers inventoried Defendant's property, including his wallet. Tr. at 20.

54. During the inventory search after his arrest, the detectives discovered another identification reflecting Defendant's given name was Walter Thompson. Tr. at 20; Gov't Exhibit 2.

55. Inside the backpack, Detective Love found numerous Food Saver bags, small sandwich bags, a food heat sealer, and a Lenovo Chromebook box. Tr. at 54-55.

56. The Lenovo Chromebook box contained five plastic bags containing a white crystal substance. Tr. at 56.

57. The white crystal substance was field tested and returned a positive result for methamphetamine. Tr. at 56.

58. The entire encounter took fifteen to twenty minutes. Tr. at 21.

59. Defendant Thompson also testified at the suppression hearing. Tr. at 66-80.

60. Defendant testified as follows[4]:

    a. Defendant is 36 years old with some college education. Tr. at 67.

    b. On June 15, 2020, Defendant was traveling from Flagstaff, Arizona to Illinois via train when the train stopped in Kansas City, Missouri. Tr. at 67-68.

---

[4] Defendant was reminded, on the record, by his counsel of his right not to testify. Tr. at 66. Despite this reminder, Defendant was adamant in his decision to testify. *Id*.

c. During the stop, Defendant was seated and drinking a cup of coffee when he first observed the detectives on the train. Tr. at 69.

d. Defendant observed the detectives walking back and forth on the train, not speaking to anyone. Tr. at 69-70.

e. Defendant initially testified that Detective Lanaman sat down next to Defendant and asked if he had seen anything suspicious. Tr. at 69-70.

f. Defendant later testified that Detective Lanaman was approximately two to three feet in front of Defendant, and he would lean in to speak with Defendant. Tr. at 70.

g. Defendant advised Detective Lanaman that he had not seen or heard anything suspicious. Tr. at 70, 72.

h. Although he did not initially identify himself, Defendant states that after Detective Lanaman asked about suspicious activity, Detective Lanaman identified himself as a drug interdiction traffic officer. Tr. at 69.

i. Detective Lanaman then asked Defendant if he had identification and a train ticket. Tr. at 70-71, 72, 75.

j. Defendant searched around for these items and provided them to the detective. Tr. at 71-72, 75.

k. The identification and train ticket Defendant provided to Detective Lanaman were in the name of Adam Ross Bray. Tr. at 75-76.

l. According to Defendant, when he was putting his identification and ticket back in his bag, Detective Lanaman asked if he could search the bag. Tr. at 71.

m. Defendant testified he told Detective Lanaman at this time "no, you can't search my bag." Tr. at 71.

n. Defendant zipped up his bag and placed it close to him. Tr. at 71.

o. Defendant initially testified that Detective Lanaman asked if he would submit to a canine sniff and Defendant told him no. Tr. at 71-72. Defendant later testified that the detective told him to get off of the train and submit to the dog sniff. *Id.* But at a later point in his testimony, Defendant one again testified the detective "asked" him for consent to have the dog sniff his bag. Tr. at 72.

p. Defendant subsequently stood up, grabbed his bag, and walked off the train. Tr. at 71-72, 77.

q. Once off the train, Defendant set his bags down on the ground. Tr. at 72-73, 77.

r. According to Defendant, the detective then told "the police" to hold Defendant there while the detective went and retrieved the canine. Tr. at 71.

s. Defendant testified that at no point during their encounter did Detective Love pull a gun out or hold him at gun point. Tr. at 78-79.

t. Defendant and Detective Love were standing close enough to each other that their arms could touch. Tr. at 74.

u. Defendant testified that "the dog ran around the ground and the dog sat on the ground." Tr. at 73.

v. Defendant did not believe that the canine sitting next to his bag was a hit as he has previously observed a dog hit a bag. Tr. at 73.

  w. Defendant testified he never provided consent to search his bags after the canine performed her sniff.  Tr. at 73.

61. The undersigned does not find Defendant's testimony as credible for the following reasons:

  a. There are several inconsistencies in Defendant's testimony.  For example, Defendant initially testified Detective Lanaman sat down next to him during their initial encounter.  Tr. at 69.  But then Defendant later testified Detective Lanaman was "right in front of [him]," and the detective "leaned in" to speak with him.  Tr. at 70.  Furthermore, Defendant testified he told Detective Lanaman on multiple occasions he did not consent to a search (Tr. at 71), but also testified on direct examination that he gave the detective his backpack.  Tr. at 71.  When Defendant described what took place on the train, he indicated on several occasions Detective Lanaman requested consent for a canine sniff, but on other occasions he indicated the detective ordered him off the train to submit to a canine sniff.  Tr. at 71-73.

  b. In addition, Defendant admits to traveling under a false identity and providing the detectives with identification and a train ticket bearing a name different than his own.  Tr. at 75-76.

  c. Defendant also admits to being on supervised release out of the Northern District of Indiana, and that he left his district without the permission of his probation officer.  Tr. at 77.

11

> d. Defendant appeared stressed and nervous during his testimony at the suppression hearing held before this Court, including an exclamation of "Damn" when he could not recall the destination of his train ticket. Tr. at 68.

### III. DISCUSSION

Defendant seeks to suppress all evidence obtained from the search and seizure of his bags on June 15, 2020. Doc. 22 at 1. Defendant argues the search and seizure violated his Fourth Amendment rights because the police detained him without a warrant, probable cause, or valid consent. *Id*. Defendant contends that after he initially refused consent for the police to search his bags, the remainder of the encounter became an illegal seizure. *Id*. at 4. The Government argues the initial encounter was consensual, and Defendant consented to the search in question based on his statements and actions. Doc. 23 at 5.

The Fourth Amendment specifically provides, "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ." U.S. CONST. amend. IV. As protection for citizens from unwarranted government intrusion, the Fourth Amendment's reasonableness requirement generally obligates police officers to obtain a judicial search warrant, issued only upon a showing of probable cause, before searching private property. *See*, *e.g.*, *Shade v. City of Farmington, Minn.*, 309 F.3d 1054, 1059 (8th Cir. 2002). The United States Supreme Court has held "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357 (1967) (internal footnotes omitted); *see also Arizona v. Gant*, 556 U.S. 332, 338 (2009). It is well-established that a search conducted pursuant to a valid consent is an exception to the warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973);

12

*see also Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991). Further, certain consensual encounters between law enforcement officers and citizens do not trigger Fourth Amendment protections. *See, e.g., Florida v. Bostick,* 501 U.S. 429, 434 (1991).

### A. The Initial Encounter on the Train was Consensual

The first question that must be addressed is whether the initial encounter between the detectives and Defendant on the train triggered Fourth Amendment protections. The applicability of the Fourth Amendment to police encounters with citizens depends on the nature of the encounter. The Eighth Circuit has recognized three different categories of police-citizen encounters: (1) a consensual encounter; (2) a *Terry* stop; and (3) a full-scale arrest. *United States v. Hernandez,* 854 F.2d 295, 297 (8th Cir. 1988). A consensual encounter "occurs when law enforcement officers merely approach an individual on the street and ask if he is willing to answer some questions." *Id*. The second category (a *Terry* stop) is a brief, minimally intrusive seizure for a short period of time if the police have "articulable suspicion" that the person has committed or is about to commit crime. *Id.*; *see also United States v. Flores-Sandoval*, 474 F.3d 1142, 1144 (8th Cir. 2007). The third category of a citizen-police encounter is a full-scale arrest, which must be support by probable cause. *Hernandez*, 854 F.2d at 297.

With respect to the first category, a consensual encounter does not implicate the Fourth Amendment. *See, e.g., United States v. Garcia,* 888 F.3d 1004, 1008 (8th Cir. 2018); *see also Bostick,* 501 U.S. at 434 ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions."). "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002); *see also Flores-*

13

*Sandoval,* 474 F.3d at 1145 (observing "[m]ere police questioning does not constitute a seizure."). If a reasonable person would feel free to disregard the police and go about his or her business, the encounter is consensual, and no reasonable suspicion or probable cause is required. *Bostick,* 501 U.S. at 434. A consensual encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. *Id.* A consensual encounter implicates the Fourth Amendment when the questioning is "so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave." *Flores-Sandoval,* 474 F.3d at 1145.

The Supreme Court has recognized that officers may generally ask questions of an individual even when they have no basis for suspecting a particular individual of wrongdoing. *Bostick,* 501 U.S. at 434-35. During a consensual encounter, the police may generally ask questions of the individual, may ask to examine the individual's identification, and may request consent to search his or her luggage, provided they do not induce cooperation by coercive means. *Id.*; *Drayton,* 536 U.S. at 201. If a reasonable person would feel free to terminate the encounter, he or she has not been seized. *Drayton,* 536 U.S. at 201. Courts have upheld consensual encounters between law enforcement officers and passengers on buses and on trains. *See, e.g, Drayton,* 536 U.S. at 202-04 (bus); *Garcia,* 888 F.3d at 1008-09 (train).

The determination of whether police-citizen encounters fall within the protections of the Fourth Amendment is fact intensive and turns on the unique facts of each case. *Garcia,* 888 F.3d at 1008; *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008). In examining the totality of the circumstances, courts generally consider seven non-exclusive factors which may indicate whether a consensual encounter has ripened into a seizure:

> [O]fficers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is

14

necessary, the office's retention of the person's property, or an officer's indication the person is the focus of a particular investigation.

*Griffith*, 533 F.3d at 983 (internal citations omitted); *see also Garcia,* 888 F.3d at 1008.

In considering the factors above, the undersigned finds the initial encounter between Defendant and law enforcement officers was consensual. Defendant was in a public place and made no attempt to leave or avoid the initial encounter. There was no evidence that either detective blocked the exit from the train or limited Defendant's freedom of movement. When Detective Lanaman approached Defendant and asked if he would be willing to speak with him, Defendant answered "sure." Although Detective Love was also present on the train, he stood behind the parties and out of Defendant's sight. Neither detective displayed nor drew his weapon during the entire encounter and the questions asked by Detective Lanaman were not confrontational or accusatory. Detective Lanaman did not retain Defendant's identification and train ticket after he inspected them. Furthermore, there was nothing said to suggest Defendant was a specific target or focus of a criminal investigation, or to suggest compliance with his requests was mandatory. In applying the *Griffith* factors, the initial encounter between Detective Lanaman and Defendant was consensual and did not trigger any Fourth Amendment protections.[5]

After Detective Lanaman identified himself and reviewed the identification and ticket of Defendant, he asked to search Defendant's bags. Defendant initially consented to the search, opened his bag, and started to remove items from the bag. Due to officer safety, Detective Lanaman asked if he could perform the search himself. Defendant then proceeded to zip up his bag and indicated he did not want the officer "to go into" his bag. Detective Lanaman followed-

---

[5] At the suppression hearing, Detective Lanaman testified that he had reasonable suspicion when Defendant started going through his backpack and presenting items to him. Tr. at 35-36. Because this Court recommends a finding that the entire encounter between the detective and Defendant was consensual, the Court will not address whether Detective Lanaman also had reasonable suspicion for the remainder of the encounter. *See Bostick,* 501 U.S. at 434.

15

up immediately by asking Defendant if he would be willing to have a dog sniff the exterior of the bags. Both detectives testified that Defendant agreed, voluntarily stood up, and carried his bags off the train to the exterior platform within the train station.

Defendant argues that once he refused consent for the detective to personally search his bag, the consensual nature of the encounter terminated and became an "unlawful investigatory detention" in violation of the Fourth Amendment. Doc. 22 at 4. The Court disagrees. As discussed above, the entire encounter on the train remained consensual. Although Defendant refused the detective's request to search the bag himself, Detective Lanaman subsequently requested permission to perform a canine sniff of the bag's exterior as an alternative to the search. There was no evidence that this follow-up request was coercive, confrontational, or improper. Furthermore, the Court was not provided any evidence that led or could have led Defendant to believe compliance was necessary.

In his *pro se* supplemental brief, Defendant argues he believed he had "no choice" when asked if the canine could sniff his bags. Doc. 37-1 at 14-15. However, as illustrated through the testimony, Detective Lanaman's request to perform a canine sniff was presented as an alternative request to Defendant to which he replied, "that's fine," stood up, and carried his own bags off the train. The same *Griffith* factors support a finding that the encounter remained consensual even after a second request was made for the dog to sniff the bags. The initial encounter did not lose its consensual nature simply because Detective Lanaman made a follow-up request for permission to conduct a dog sniff of the bags as an alternative. *See also United States v. Jones*, 254 F.3d 692, 696 (8th Cir. 2001) (observing "[t]here is certainly no legal rule that asking more than once for permission to search renders a suspect's consent involuntary."); *United States v. Hathcock*, 103 F.3d 715, 717-20 (8th Cir. 1997) (finding multiple requests for consent to search a bag were

16

deemed reasonable). The Court recommends a finding that the entire encounter on the train was consensual.

### B. Defendant's Consent to Search His Bag was Voluntarily Given

The next question that must be addressed is whether Defendant's consent to the canine sniff of his bags, and his subsequent consent to search the bags once the canine positively alerted to the presence of controlled substances, were voluntary. When analyzing consent, the touchstone of the Fourth Amendment is reasonableness. *Jimeno,* 500 U.S. at 250. The Supreme Court has long approved consensual searches because it is reasonable for the police to conduct a search once they have been permitted to do so. *Id.* at 250-51. A warrantless search is valid under the Fourth Amendment if conducted pursuant to the knowing and voluntary consent of the person subject to the search. *United States v. Garcia-Garcia,* 957 F.3d 887, 892 (8th Cir. 2020).

The determination of whether consent is voluntary, or was the product of duress or coercion, is a question of fact to be determined from the totality of the circumstances. *Schneckloth,* 412 U.S. at 227. The issue of consent does not turn on the defendant's subjective state of mind, but whether the officer reasonably believed the defendant consented. *Garcia-Garcia,* 957 F.3d at 892; *see also Jones,* 254 F.3d at 695 (observing that the question is "not whether [Defendant] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented."). A defendant's consent will be deemed voluntary if the Government demonstrates a reasonable person would have believed the subject of the search gave consent that was the product of an essentially free and unconstrained choice. *United States v. Cedano-Medina,* 366 F.3d 682, 688 (8th Cir. 2004).

The Eighth Circuit has recognized several factors that must be considered in determining whether consent was given voluntarily, which include:

> [P]ersonal characteristics of the defendant, such as age, education, intelligence, sobriety, and experience with the law; and features of the context in which the consent was given, such as the length of detention or questioning, the substance of any discussion between the defendant and police preceding the consent, whether the defendant was free to leave or was subject to restraint, and whether the defendant's contemporaneous reaction to the search was consistent with consent.

*Jones,* 254 F.3d at 696; *see also United States v. Correa*, 641 F.3d 961, 966-67 (8th Cir. 2011). Courts have previously grouped these factors into three categories: (1) the nature of the interaction between police and the defendant, (2) the personal characteristics and behavior of the defendant, and (3) the environment surrounding the defendant at the time he gave his consent. *Garcia-Garcia*, 957 F.3d at 897.

### (1) The Canine Sniff of Defendant's Bags

The Court recommends a finding that Defendant's consent to the canine sniff of his bags was voluntarily made. As discussed *supra,* the nature of the interaction between police and Defendant was entirely consensual. Significantly, when Detective Lanaman requested permission to conduct a dog sniff, Defendant responded "that's fine." Both detectives testified Defendant then voluntarily stood up, grabbed his bags, and carried them off the train.

The personal characteristics and behavior of Defendant also establish his consent was given voluntarily. Defendant is thirty-six years old and has some college education. Additionally, there was no evidence suggesting Defendant was under the influence of drugs or alcohol. Detective Lanaman initially approached Defendant and asked him if he would answer some questions, to which Defendant replied "sure." Detective Lanaman described Defendant as polite and cooperative during the entire encounter.

Last, the environment surrounding Defendant at the time he gave his consent establishes it was given voluntarily. Defendant acknowledged the interaction took place on a train and in a public train terminal, and at no time did any officer or detective use force or draw a weapon.

18

Neither detective restrained Defendant's movement nor placed him under arrest at the time consent was requested. Furthermore, the length of the interaction was not long or excessive, notably lasting only fifteen to twenty minutes from the time of initial contact to the time of arrest. Accordingly, the Court recommends a finding that Defendant's consent to the canine's sniff of his bag was voluntarily made.

### (2) The Subsequent Search of Defendant's Bag

After Detective Lanaman advised Defendant of the canine's positive alert he requested Defendant's permission to search his bag. Both Detective Lanaman and Detective Love testified that Defendant replied, "go ahead." There was nothing coercive about the second request for consent after the canine's positive alert. The interaction between the detectives and Defendant occurred in a public place, and neither detective used threatening or coercive language. In addition, the request for consent to search was in the form of a question with no suggestion that compliance was mandatory. Neither detective displayed his weapon, used force, or restrained Defendant in any manner. The Court finds that under the totality of the circumstances, a reasonable person would have believed Defendant gave consent that was the product of a free and unconstrained choice. The Court recommends a finding that Defendant freely and voluntarily consented to the canine sniff and to the subsequent search of his bags.

### (3) Defendant's Testimony Regarding Consent

Defendant claimed at the suppression hearing that he did not consent to the dog sniff or the subsequent search of his bags. Where the only evidence presented is "he-said-she-said" testimony, the Court must determine credibility to arrive at a factual finding. *See, e.g., United States v. Carothers,* 337 F.3d 1017, 1019 (8th Cir. 2003). As discussed *supra*, the undersigned finds

19

Case 4:20-cr-00136-BP   Document 39   Filed 03/09/21   Page 19 of 20

Defendant's testimony was not credible and that the testimony of Detectives Lanaman and Love was credible.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's Motion to Suppress. Doc. 22.

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation except on the grounds of plain error or manifest injustice.

DATE:   March 9, 2021                                */s/ W. Brian Gaddy*
                                                     W. BRIAN GADDY
                                                     UNITED STATES MAGISTRATE JUDGE