# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. 20-00136-01-CR-W-BP |
| ) | |
| WALTER D. THOMPSON, ) | |
| ) | |
| Defendant. ) | |

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DENYING DEFENDANT'S MOTION TO SUPPRESS

Pending is Defendant Walter D. Thompson's Motion to Suppress. (Doc. 22.) After a *de novo* review, the Court adopts Judge W. Brian Gaddy's Report and Recommendation, (Doc. 39), and **DENIES** Defendant's motion to suppress.

## I.  BACKGROUND

The Court adopts the Report in its entirety, including its recommended findings of fact. In summary, Detectives Jared Lanaman and Colin Love of the Kansas City Police Department were working at an Amtrak train station on June 15, 2020, along with a narcotics canine. Detectives Lanaman and Love testified that the following occurred that day:

The Detectives were walking through a train looking for suspicious activity and saw Defendant sitting with a duffel bag and backpack tucked beneath his chair, even though the baggage space above his seat was open. This made Detective Lanaman suspicious, and he and Detective Love approached Defendant. Detective Lanaman stood in the aisle of the train car, approximately three or four feet from Defendant, while Detective Love stood several rows behind Defendant. Both officers were in plain clothes and did not reveal their firearms during their encounter.

Detective Lanaman asked Defendant if Defendant would be willing to speak to him, and Defendant said "sure." Detective Lanaman then displayed his badge and indicated that he was an officer with the Missouri Western Interdiction Narcotics Team. He asked Defendant for his identification and ticket, which Defendant voluntarily produced. Both items were in the name of "Adam Bray." Defendant indicated that he had been in Arizona visiting his girlfriend.

Detective Lanaman returned these items to Defendant and asked to search Defendant's bags. Defendant assented, opened his backpack, and began removing items from it. Detective Lanaman requested to search the backpack himself, but Defendant indicated that he did not want Detective Lanaman to "go into" the bag and closed it. Detective Lanaman then asked Defendant if he would allow the drug canine to inspect the bags, to which Defendant responded, "that's fine." Detective Lanaman asked if Defendant would be willing to allow the canine inspection to occur on the outside platform; Defendant stood up, took the bags, and walked off the train. The Detectives followed, and Detective Lanaman went to get the canine, leaving Defendant with Detective Love.

Once the canine arrived, it alerted to the presence of narcotics after sniffing Defendant's duffel bag. Detective Lanaman advised Defendant of this and asked if he could search the duffel bag, to which Defendant replied, "just go ahead." Detective Love searched the duffel bag and found several bags and boxes containing a white substance he recognized as methamphetamine. The Detectives placed Defendant under arrest on a twenty-four-hour investigative hold and inventoried his property. Detective Lanaman later testified that Defendant did not seem to be under the influence of any intoxicant, was polite and cooperative, and appeared to be of at least average intelligence based on his interactions with Defendant leading up to the arrest.

2

On June 23, 2020, Defendant was indicted for possessing with intent to distribute more than 50 grams of methamphetamine.  (Doc. 9.)  On September 29, 2020, Defendant filed a motion to suppress all evidence stemming from his encounter with the Detectives on June 15, arguing that the Detectives subjected him to an unconstitutional warrantless search and seizure.  (Doc. 22.)  The Honorable W. Brian Gaddy held an evidentiary hearing regarding Defendant's motion on November 9, 2020.  (Doc. 32.)

At the evidentiary hearing, Defendant insisted on testifying; his testimony differs in several pertinent ways from the recollections of the Detectives.  According to Defendant's testimony, Detective Lanaman initiated the encounter on the train by sitting down next to him, leaning in close, and asking whether Defendant had seen anything suspicious.  (Doc. 36, p. 69 (hearing transcript).)  After Defendant responded in the negative, Detective Lanaman apparently asked for Defendant's identification and ticket—which Defendant handed over without protest—and then asked to search his bag.  (*Id*. at p. 71.)  Defendant testified that he categorically refused to allow Detective Lanaman to search his bag or submit the bag to inspection by the drug canine, after which Detective Lanaman ordered him to leave the train.  (*Id*.)  When asked to describe his feelings about the encounter, Defendant said that he "had no choice" about whether to leave the train and submit to the canine sniff test.  (*Id*. at p. 73.)  But on cross-examination, Defendant admitted that neither Detective ever showed him a firearm, that the train and the platform were public areas, and that he carried his bags to the train platform himself.  (*Id*. at p. 77.)

Judge Gaddy did not find Defendant's testimony credible, and based on the Detectives' testimony, recommended denying Defendant's motion to suppress on March 9, 2021.  (Doc. 39.)  Defendant has now filed objections to Judge Gaddy's recommendation, (Doc. 43), to which the Government has responded.  (Doc. 44.)  After conducting a *de novo* review of the briefing and the

3

hearing transcript, the Court finds that Defendant's testimony was not credible, and that Defendant's interactions with the Detectives were consensual. Consequently, the Court adopts Judge Gaddy's Report and Recommendations, and **DENIES** Defendant's motion to suppress.

## II. DISCUSSION

The Court adopts Judge Gaddy's Recommendation; this discussion is meant to confirm, rather than supplant, his legal analysis. As an initial matter, Defendant objects to Judge Gaddy's conclusion that his testimony at the evidentiary hearing was not credible. (Doc. 43, pp. 6–7.) But the Court agrees with this assessment. Defendant could not remember where he had come from or where he was going on the Amtrak train, (Doc. 36, p. 68 (Defendant exclaims "damn" because he can't remember the destination)); initially claimed that Detective Lanaman sat in the seat next to him, but later stated that Detective Lanaman was "right in front of" him, (*id.* at pp. 69–70); and was generally unsure of his testimony, at one point admitting "I don't even know where I am" in the middle of a lengthy narration. (*Id.* at p. 71.) The Court therefore finds that, to the extent that Defendant's testimony conflicted with the Detectives', the Detectives were the more credible witnesses—and thus accepts the recollections of the Detectives as the operative facts for purposes of this Order.

After determining that the Detectives' testimony was more credible than Defendant's, Judge Gaddy discussed the legality of their interactions with Defendant on the train and, later, the platform. Normally, the Fourth Amendment prohibits searches and seizures conducted without a warrant, "subject [] to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One of these exceptions is a search conducted with the valid consent of the searched party. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Although determining whether a search is consensual is a "fact intensive" inquiry that "turns on

4

the unique facts of each case," the Eighth Circuit has recognized seven non-exclusive factors to perform this analysis:

> [1] officers positioning themselves in a way to limit the person's freedom of movement, [2] the presence of several officers, [3] the display of weapons by officers, [4] physical touching, [5] the use of language or intonation indicating compliance is necessary, [6] the officer's retention of the person's property, or [7] an officer's indication the person is the focus of a particular investigation.

*United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008). Moreover, consent exists so long as a defendant's "conduct would have caused a reasonable person to believe that he consented," regardless of whether the defendant "consented subjectively." *United States v. Jones*, 254 F.3d 692, 696 (8th Cir. 2001).

The Court agrees with Judge Gaddy's conclusion that the encounter between Defendant and the Detectives was consensual under these factors. It does not appear that the detectives positioned themselves to limit Defendant's freedom of movement—especially because it is uncontested that Defendant was able to walk out of the train car after the Detectives asked him to submit his bags for a canine sniff test. Moreover, only two law enforcement officers were present, and according to Detective Love, Defendant was not able to see him when Detective Lanaman initiated the encounter. Neither officer displayed a weapon during the encounter or physically touched Defendant, and Detective Lanaman asked permission before touching Defendant's belongings. The Detectives did not retain Defendant's property either; Defendant admitted in his testimony that Detective Lanaman returned his identification and train ticket, and that he carried his bags off the train himself. (Doc. 36, pp. 75, 77.) There is nothing in the record to indicate that either Detective told Defendant that he was the subject of a particular investigation, and only Defendant's testimony to indicate that the Detectives used language indicating that Defendant was required to comply with their requests.

5

Case 4:20-cr-00136-BP   Document 50   Filed 04/08/21   Page 5 of 8

And, most importantly, Defendant repeatedly indicated his consent to both conversing with the Detectives, and the Detectives searching his bags. When Detective Lanaman asked Defendant if he was willing to have a conversation, Defendant said "sure"; when Detective Lanaman asked for Defendant's identification and ticket, Defendant voluntarily produced them; when Detective Lanaman requested to search Defendant's backpack, Defendant opened it and began removing its contents; when Detective Lanaman asked whether a drug canine could sniff his duffel bag, Defendant said "that's fine," and then stood up and carried his bags off the train. The only time Defendant said anything that would cast doubt on his consent was when he stated that he did not want Detective Lanaman to "go into" his backpack—upon which Detective Lanaman backed off and did not repeat his request to search the backpack himself. In short, Judge Gaddy accurately concluded that Defendant consented to the encounter with the Detectives on the train, and later, the search on the platform.

Defendant offers three lines of objections to this conclusion. First, he argues that Judge Gaddy failed to take into account the Government's burden to prove that the encounter was consensual. (Doc. 43, pp. 1–2.) But as the Government observes, Judge Gaddy specifically noted that the Government bore the burden to prove that the encounter was consensual, (Doc. 36, p. 4 (hearing transcript)), and his Report and Recommendation accurately summarizes the legal standard for consent to a law enforcement encounter in the Eighth Circuit. And, more importantly, the record as a whole shows that the Government satisfied its burden of proof on the issue. Therefore, this objection is unavailing.

Second, Defendant contends that his consent was involuntary, and therefore invalid; he believes that Judge Gaddy should have made findings of fact on whether Defendant was informed that he could leave, or otherwise familiar with the legal system. (Doc. 43, pp 2–6.) Defendant

6

claims that by continuing to question him after he refused consent to search his backpack, the Detectives "broke [Defendant's] will . . . through a procedure used to coerce and overcome his will." (Doc. 43, p. 5.)

The Court disagrees. Defendant mischaracterizes the Government's burden of proof to establish consent; it was "not required to demonstrate that [Defendant] knew of his right to refuse the request to search," but simply to show that "a reasonable officer would believe that the consent was not the result of 'duress or coercion, express or implied.'" *United States v. Garcia-Garcia*, 957 F.3d 887, 897 (8th Cir. 2020) (quoting *United States v. Cedano-Medina*, 366 F.3d 682, 687–88 (8th Cir. 2004)). And Judge Gaddy correctly applied the *Griffith* factors to determine that Defendant's consent was not the result of any sort of duress or coercion. As to Detective Lanaman's choice to continue questioning Defendant after Defendant refused permission to search his backpack, Judge Gaddy accurately observed that there "is certainly no legal rule that asking more than once for permission to search renders a suspect's consent involuntary." (Doc. 39, p. 16 (quoting *Jones*, 254 F.3d at 696).) Finally, as the Government points out, Defendant was on supervised release from a prison term he had been serving due to a sentence in the Northern District of Indiana, (Doc. 36, p. 77 (hearing transcript)), indicating that Defendant had at least some familiarity with the legal system. In sum, the Court finds no error in Judge Gaddy's analysis of whether Defendant's consent was voluntary.

Third and finally, Defendant takes issue with some of the Report and Recommendation's findings of fact. Specifically, Defendant objects to numbered paragraphs 25, 29, and 34—which indicate, respectively, that Defendant "voluntarily" handed over his identification and ticket, "consented to" the search of his backpack, and "agreed to" allow a canine to inspect his duffel bag—because they represent legal conclusions to which a witness could not testify. (Doc. 43, p.

7

6.) But the words "voluntarily," "consent," and "agree" have both legal and nonlegal meanings; for instance, a person can verbalize "agreement" (which a witness can testify about) without necessarily forming a legal "agreement" (which a witness cannot testify about). In employing these terms to summarize witness testimony, the Report and Recommendation invokes their nonlegal sense; and regardless, these arguments do not bear on the fundamental soundness of Judge Gaddy's analysis.

### III.  CONCLUSION

For the foregoing reasons, the Court adopts the Report and Recommendation of Judge Gaddy and **DENIES** Defendant's motion to suppress.  (Doc. 22.)

**IT IS SO ORDERED.**

DATE:  April 8, 2021

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
UNITED STATES DISTRICT COURT